UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


JACK HALL,

                  Petitioner,

v.                                                 Case Number 07-10279-BC
                                                 Honorable Thomas L. Ludington

MARY K. BERGHUIS,

                  Respondent.

_____ /


**OPINION AND ORDER DENYING HABEAS CORPUS PETITION, GRANTING IN PART AND DENYING IN PART A CERTIFICATE OF APPEALABILITY, AND GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

Petitioner Jack Duane Hall is presently confined at G. Robert Cotton Correctional Facility in Jackson, Michigan, and has filed a pro se application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On May 12, 2000, Petitioner was convicted by a jury in Genesee County, Michigan, and sentenced by the trial court to the following: imprisonment for thirty to fifty years for each of two counts of first-degree criminal sexual conduct ("CSC"), Mich. Comp. Laws § 750.520b; ten to fifteen years for one count of second-degree CSC, § 750.520c; two to four years for each of two counts of felonious assault, § 750.82; fifty to seventy-five years for each of two counts of attempted murder, § 750.91; eighteen to thirty-five years for each of two counts of assault with intent to commit murder, § 750.83; five to ten years for one count of disarming a police officer, § 750.479b(2); and a consecutive term of two years for one count of possession of a firearm during a felony, § 750.227b.

Petitioner filed a motion for new trial in which he alleged that he was denied effective assistance of counsel, that the trial court erroneously excluded evidence of a look-alike suspect, and

that another individual's DNA should have been analyzed.  The trial court held an evidentiary hearing and denied Petitioner's motion.

Petitioner raised those and additional issues when he appealed his conviction pro se.  The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished, *per curiam* opinion, *People v. Hall*, Nos. 228551 & 228552, 2003 WL 193517 (Mich. Ct. App. Jan. 28, 2003), and on August 29, 2003, the Michigan Supreme Court denied leave to appeal.  *People v. Hall*, 668 N.W.2d 149 (table) (Mich. 2003).

In 2003, Petitioner filed two motions for relief from judgment, which the trial court denied.[1] The Michigan Court of Appeals denied leave to appeal the trial court's decision for failure to establish entitlement to relief under Michigan Court Rule 6.508(D).  *People v. Hall*, No. 258449 (Mich. Ct. App. Apr. 7, 2005).  On November 29, 2005, the Michigan Supreme Court denied leave to appeal on the same ground.  *People v. Hall*, 706 N.W.2d 19 (table) (2005).

Petitioner filed his habeas corpus petition on January 18, 2007.  Petitioner alleges violations of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution based on eleven main contentions, including: (1) the police conducted an unconstitutional search and seizure; (2) the pretrial identification procedures were suggestive; (3) the prosecutor engaged in  misconduct; (4) he was denied a fair and impartial jury; (5) his convictions violate the principle of double jeopardy; (6) he was denied an appeal of right; (7) he was denied his constitutional right to compulsory process; (8) the trial court deprived him of his right to present a defense; (9) his trial attorney was ineffective; (10) his appellate attorney was ineffective;

---

[1]  Petitioner attempted to file a third motion for relief from judgment in 2004, but the motion was returned to him without being filed because it was deemed successive to his prior motions.

-2-

and (11) he is innocent.

Respondent Mary K. Berghuis asserts in an answer to the habeas petition filed through counsel that the habeas petition fails to specify any grounds for relief and that the claims that Petitioner raised in state court lack merit, are not cognizable on habeas review, or are barred by the doctrine of procedural default. In this case, any procedural defaults or failure to exhaust state remedies will be excused. *See Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008) (explaining that a federal habeas court need not address a procedurally defaulted issue before deciding against a petitioner on the merits);*White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005) (stating that "the exhaustion requirement is not a jurisdictional one but rather is an issue of comity between federal and state courts"). A review of the record and the claims articulated in the habeas petition establish that Petitioner's claims lack merit and the petition will be denied.

I

On July 24, 1999, Petitioner allegedly forced a fourteen-year-old girl, K.W.[2], and her eight-year-old sister, J.W., into the woods and sexually assaulted them. At trial, the girls identified Petitioner as their assailant. Two days after the sexual assault, Petitioner became involved in a shoot-out with police officers who were looking for him at his parents' home. The two incidents gave rise to two criminal cases, which were consolidated for trial.

James Wray testified that he was cycling with his grandson about 6:00 p.m. on July 24, 1999, when he saw Petitioner on the bike trail in Clio, Michigan. He knew Petitioner and stopped to talk with him. Petitioner was seated on a picnic table next to a fork in the trail. On the same evening, Cheryl Ware saw Petitioner talking to a gray-haired man and a child on the Clio bike trail.

---

[2] The Court will refer to the CSC victims by their initials to protect their privacy.

Petitioner was wearing a blue tank top, dark-colored pants or shorts, and a hat.  He had a goatee or moustache and was seated on a picnic table, holding a can.  Marko Vance was jogging with a friend between 5:00 p.m. and 7:00 p.m. when he saw Petitioner sitting on a picnic table and smoking a cigarette.  Police Officer William Webb saw Petitioner at the fork in the trail about 6:00 p.m.  He claimed that Petitioner was wearing a black ball cap and a short-sleeved black tee shirt; his hair was black and shoulder-length; and his breath smelled of intoxicating beverages.

Between 8:00 and 9:00 p.m. on July 24, 1999, Wendy Sheppard's neighbor brought two frightened girls to her house on Wilson Road.  The girls were covered with blood and mud, and they were not wearing shoes.  The younger girl's complexion was bluish gray.  The police were called, and the girls were taken to the hospital.  Paramedic Timothy Burchett testified that both girls had blue faces, bloodshot eyes, and striation marks along their necks.  Based on what they told him, he broadcast a description of the suspect.  The description was of a white male wearing a blue tank top, knee-length shorts, and white tennis shoes with black trim; 5'6" to 5'7" tall and skinny; shoulder-length hair trimmed around the ears and razor stubble or a goatee with a mustache.

K.W. testified that she and her sister were walking on the Clio bike path about 6:00 or 7:00 p.m. on July 24, 1999, when they saw Petitioner sitting on a picnic table near a fork in the path.  He was drinking Budweiser beer.  They saw him again on their way home.  Petitioner pulled out a knife, placed the knife behind J.W., and said, "Why don't you two ladies follow me."  Petitioner then took them into the woods.  He told them that his name was Mike.  He was wearing a blue tank top, blue jean shorts, a dark-colored hat, and dark sunglasses.  A box of Marlboro cigarettes was sticking out of his back pocket.

When he took off his shorts, K.W. noticed that he was wearing silky red and blue underwear

that resembled women's underwear.  He took off their clothes and made K.W. suck his penis two times.  He made an up and down motion with his hand in the area of J.W.'s vagina.  Later, he let them put on their clothes, but he handcuffed K.W. to a tree.  He took J.W. with him to find a shoe that he had lost.  When he returned with J.W., he said that he would have to kill them because they could identify him.  He began to choke J.W. with his hands.  Because that did not work, he took one of the shoelaces out of his shoe and choked J.W. with it.  J.W. passed out.  Then Petitioner choked K.W. with the shoe lace.  She thought she was dead.  When she woke up, her handcuffs were off, and her sister was already awake.  They got up and ran to a lady's house.

Later, K.W. gave a description of the person to Sergeant Ives Potrafka, and she viewed three photo arrays with six pictures in each array.  The last array was shown to her in her home after her mother woke her up.  At first, she picked out the man in position number two, who was wearing a blue tank top and had long hair.  However, when she looked closely at this face, she realized it was not the man who had assaulted them.  Then she covered up the hair of the man in position number five and identified him.  Although his hair was not long in the photograph, there was something distinctive about his eyes, and she remembered his face.

J.W. testified similarly to K.W.  She claimed that Petitioner had tried to put his finger inside her and that he took off K.W.'s handcuffs  before leaving the area.

Sergeant Ives Potrafka of the Genesee County Sheriff's Department testified that, initially, a man named Stephen Hicks was detained because his clothing and facial features were similar to the description given of the suspect.  A DNA sample was taken from Mr. Hicks, and his photograph was placed in the first two photo arrays, which K.W. viewed.  Petitioner's photograph was not in those photo arrays, and K.W. did not pick anyone out of those arrays.  After K.W. was released from

the hospital, she took Sergeant Potrafka to the scene of the crime where they found a sandal and a pair of sunglasses that the girls identified as belonging to the suspect.

On July 25, 1999, Sergeant Potrafka and Lieutenant Gilbert of the Davison Police Department were leaving the girls' apartment building when a boy named Timothy Brooks approached them and stated that he knew someone who matched the description he had heard on television. Timothy asked to see a picture of the suspect, and Lieutenant Gilbert showed him a picture that was similar to the suspect. Timothy then said that he knew someone who looked just like that and lived in the apartment complex. He pointed out a white vehicle that was registered to Petitioner, and he described a blue pick-up truck that he also associated with Petitioner.

The officers left the area, but about twenty minutes later, Sergeant Potrafka received a message that the pick-up truck was now at the complex. He returned to the apartment complex and determined that the truck belonged to Petitioner, but the license plate on the truck belonged to a different vehicle, one registered to Lynn Furness. Potrafka used a cell phone to call the number painted on the side of the truck. A man answered the call and stated that his name was "Mike." Sergeant Potrafka asked "Mike" to come down and discuss a problem with the truck. "Mike" said that he would be down, but he did not show up.

Meanwhile, Petitioner's girlfriend, Lynn Furness, arrived and unlocked Petitioner's apartment so that Sergeant Potrafka could enter it. The apartment was empty, but a gas grill on the balcony was lit and there were two steaks lying next to the grill. Sergeant Potrafka then re-dialed the telephone number painted on Petitioner's truck, and the telephone in the apartment rang. Later that night, a search warrant was obtained, and several officers searched Petitioner's apartment. Among the items seized were four boxes of Marlboro cigarettes, a black ball cap, a handcuff case

-6-

and belt, blue jean shorts, some bikini briefs, and a blue tank top.

Lynn Furness testified that she had a key to Petitioner's apartment on July 25, 1999, and that she had permitted Sergeant Potrafka and another officer to enter the apartment because Potrafka threatened to arrest her if she did not cooperate. She claimed that Petitioner had asked her to wash his blue jean shorts on the evening of July 25, 1999, after they had been boating.

Deputy Sheriff Douglas Sepanak testified that he interviewed Lynn Furness on July 25, 1999, at about 11:18 p.m. She told him that Petitioner had asked her to wash his blue jean shorts at 1:30 a.m. that day. She was washing the shorts as they spoke. She handed Petitioner's apartment key to Deputy Sepanak, and the police used the key to enter Petitioner's apartment after they acquired a search warrant.

About 5:00 or 5:30 a.m. on July 26, 1999, Sergeant Potrafka and Captain Compeau went to the home of Petitioner's parents on Lake Road in Genesee County. They had hoped to locate and arrest Petitioner. Captain Compeau instructed Deputy Angela Letaski, who was assisting them and was dressed in full uniform, to go to the back of the house while he and Sergeant Potrafka talked to the woman who answered the front door. Shortly afterward, Captain Compeau and Sergeant Potrafka heard a scream and the word "gun." They ran to the back yard where they heard two gunshots and observed Deputy Letaski struggling with Petitioner over Deputy Letaski's gun. Petitioner broke free and fired one shot at Sergeant Potrafka, who fired two shots in return. Captain Compeau fired several shots. Petitioner then ran into the woods behind the house. The officers did not chase him because of the obvious danger to them. Sergeant Potrafka later heard a female voice telling Jack to please turn himself in. Petitioner surrendered to the police approximately a day and a half later.

-7-

Deputy Letaski testified that Petitioner grabbed her gun when she walked toward the back of the house. Petitioner fired her gun two times while he was struggling with her. He fired the gun a third time as he ran away.

Petitioner's mother, Sharon Hall, testified that Petitioner was not inside her home on July 26, 1999, when the police knocked on her door. She heard one gunshot a few seconds after a female officer walked toward the back of the house. Then she heard several more gunshots. She subsequently discovered Petitioner's shirt and a lighter near the telephone in their garage. Her son John called the police to let them know that they could pick up Petitioner. Petitioner cut his hair before the police arrived on July 28, 1999. Her son John insisted that the police unload the gun in front of the family.

John Christian, Petitioner's half brother, testified that he learned from the media that at least two gunshots had been fired from the gun that he turned over to the police. He denied purchasing any ammunition and placing it in the gun.

Deputy Sheriff Kevin Shanlian served a search warrant on Petitioner's family at their Lake Road address and found a knife lying on the floor of an abandoned vehicle in the back yard.

Other items admitted in evidence included a pair of sunglasses, which Captain Michael Compeau picked up at the scene of the sexual assault, a Budweiser beer can, which was found in a trash barrel near the picnic table where Petitioner was observed on July 24, 1999, and five Budweiser beer cans, which were found in Petitioner's truck. No identifiable fingerprints were found on any of the items in evidence, according to print examiner Gary Ginther. However, the number stamped on the bottom of the Budweiser beer found near the picnic table where Petitioner was observed on July 24, 1999, matched the sequence of numbers on the five beer cans found in

Petitioner's truck.  Mr. Ginther determined that all six beer cans were processed at the same bottling plant, on the same line, and during the same fifteen-minute increment.

State policeman Ronald Crichgon testified that seven of the fired cartridge casings found at the scene of the shoot-out matched Captain Compeau's weapon and that two of the casings came from Sergeant Potrafka's gun.  Deputy Sheriff Michael Jacobi claimed that the magazine of the gun, which Petitioner's family surrendered to the police, was fully loaded and that there was one spent casing in the chamber.

Shawn Weiss participated in the analysis of DNA samples submitted for analysis.  He explained that there was DNA on the ear piece of the sunglasses in evidence, but that there was only enough DNA to analyze one of eight genetic systems.  Captain Compeau's DNA was compatible with the DNA on the earpiece, but one of every three Caucasians would have matched the single genetic system.  Petitioner's DNA did not match the DNA on the earpiece of the sunglasses.

The police asked John Helcher, who worked at Hurley Medical Center, to take a sample of Petitioner's pubic hair.  Helcher had a difficult time complying with the request because Petitioner had shaved his pubic hair.

Petitioner did not testify, but he presented four witnesses:  Robert Clayton, Timothy Brooks, Jeanette Liugavitz, and Kevin Shanlian.  Mr. Clayton testified that he was a licensed gun dealer who lived near Petitioner's parents.  He denied selling any ammunition to the Hall family in recent years. Timothy Brooks testified that, when he approached the police at Petitioner's apartment complex and asked whether he could see a picture of the suspect, the police showed him a picture of Petitioner and said that the picture looked like the guy they thought did it.

Ms. Liugavitz stated that she lived near Petitioner's parents and that, on July 25, 1999, or

thereabouts, she heard one gunshot and then five more shots.  On cross-examination, Ms. Liugavitz admitted that she was not sure about the number of shots she heard.

Officer Shanlian testified that, when Steven Hicks was detained, his blue tank top and blue jean shorts were taken from him, as well as a folding knife with a black handle.  Mr. Hicks was 6'4" tall and 225 pounds.  His DNA sample was never sent to the lab for testing.

The defense theory was that the prosecution witnesses were not credible and that the prosecution did not prove its case beyond a reasonable doubt.  More specifically, defense counsel claimed that K.W. and J.W. were mistaken in their identification of Petitioner and that only one gunshot was fired from Deputy Letaski's weapon.

II

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that

-10-

principle to the facts of the prisoner's case." *Id*. at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id*. at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409. "Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence." *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)).

A

First, Petitioner claims that the police conducted an unconstitutional search and seizure at his apartment and at his parents' house. Petitioner contends that the police lacked a warrant and probable cause to enter his parents' property and to search his and his parents' residences. In *Stone v. Powell*, the Supreme Court stated that, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. 465, 482 (1976). For a "full and fair" opportunity to have existed, the state must have provided a mechanism for raising the claim and presentation of the claim must not have been frustrated by a failure of that mechanism. *Gilbert v. Parke*, 763 F.2d 821, 823 (1985) (citing *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982)).

In Michigan, criminal defendants may move to suppress evidence before or during trial, *People v. Ferguson*, 135 N.W.2d 357, 358-59 (Mich. 1965), and even on appeal, *People v. Harris*, 291 N.W.2d 97, 99 (Mich. 1980). Although Petitioner did not move to suppress evidence allegedly obtained in violation of the Fourth Amendment, his attorney's failure to take advantage of the

-11-

opportunity to do so is not a reflection on the mechanism for adjudicating suppression claims. *Jennings v. Rees*, 800 F.2d 72, 77 (6th Cir. 1986). "All that *Stone v. Powell* requires is an 'opportunity' for full and fair consideration of the claim for suppression; it is up to the claimant and his counsel to decide what use, if any, is to be made of the opportunity." *Id*. Petitioner had a full and fair opportunity for presentation of his Fourth Amendment claim in state court, and there was no failure of the mechanism for raising his claim. Therefore, this Court is not required to address the substantive merits of Petitioner's Fourth Amendment claim. The petition will be denied as to this claim.

B

Second, Petitioner alleges that the pretrial identification procedures used in his case were unnecessarily suggestive and led to a substantial likelihood of misidentification. According to Petitioner, J.W. identified him only in court where it was obvious that he was the defendant, and K.W. identified him in the third photo array after a police officer suggested that she cover up the men's hair and take another look. The trial court conducted a hearing on this issue and determined that there was nothing improper or inherently suggestive about the pretrial identification procedures.

It is true that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals." *Simmons v. United States*, 390 U.S. 377, 383 (1968). However, "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id*. at 384. A reviewing court must decide whether "the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection." *Cornwell*

-12-

*v. Bradshaw*, 559 F.3d 398, 413 (6th Cir. 2009).

If the pretrial identification was unnecessarily suggestive, the court must consider whether, under the circumstances, the identification was reliable even though the confrontation procedure was suggestive. *Neil v. Biggers*, 409 U.S. 188, 199 (1972). Five factors to consider in determining whether a suggestive identification was nevertheless reliable include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199-200.

K.W. testified at trial that she initially identified someone other than Petitioner because that man was wearing a blue tank top in the photograph and had long wavy hair like the man who assaulted her and her sister. After she looked closely at the man's face, she decided that he was not the correct man. She subsequently covered up the hair of the person who looked a little like Petitioner and realized that he was the person who assaulted her. She did not remember anyone telling her not to worry about the hair, and she claimed that no one told her Petitioner was the suspect. Trial Tr. 67-70, 74-75, 91-94, 98-100 (May 4, 2000).

Deputy Sheriff Douglas Sepanak testified that he told K.W. to look at the faces, not the hair. However, he claimed that he made this remark before K.W. picked out the man who was not Petitioner. Trial Tr. 45-47 (May 9, 2000). Because the record indicates that Deputy Sepanak did not influence K.W. to pick Petitioner from the array of six photographs, the Court concludes that the pretrial photographic array was not suggestive.

As for J.W.'s in-court identification of Petitioner, there was an independent basis for her identification, even assuming that the pretrial identification at the preliminary examination was

-13-

suggestive. She had a substantial amount of time to view the suspect during the crime, and her degree of attention was good. She noticed Petitioner on her way into the park and on the way out of the park. Her description of the suspect's clothing was accurate, and she was certain that Petitioner was the man who assaulted her. She recognized him by his eyes and by the shape of his face. Finally, although the time between the crime and the identification was five months, the Supreme Court has upheld a pretrial identification that occurred seven months after the crime. *See Biggers*, 409 U.S. at 201. The Court concludes that there was an independent basis for the arguably suggestive pretrial procedure used on J.W. The Court further concludes that the pretrial identification procedure used on K.W. was not impermissibly suggestive. Thus, the habeas petition will be denied as to this claim.

C

Third, Plaintiff contends that he is entitled to habeas relief based on prosecutorial misconduct. The Michigan Court of Appeals adjudicated Petitioner's prosecutorial-misconduct claim for "plain error" because Petitioner did not object to the alleged misconduct at trial. The court of appeals then addressed each allegation of prosecutorial misconduct and concluded that the prosecutor's conduct and comments did not constitute plain error affecting Petitioner's substantial rights.

To prevail on a claim of prosecutorial misconduct, it is not enough to show that the prosecutor's conduct or remarks were undesirable or even universally condemned. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Petitioner must demonstrate that the prosecutor's conduct infringed on a specific constitutional right or infected the trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

-14-

The complained-of conduct must be both improper and flagrant, *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006), cert. denied, 549 U.S. 1255 (2007), and "so egregious . . . as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979). When determining whether a prosecutor's conduct was flagrant, courts must consider "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994).

Each of Petitioner's four main claims of prosecutorial misconduct will be addressed in turn.

1

First, Petitioner contends that the prosecutor commented on facts not supported by the evidence during closing arguments. Prosecutors may not misrepresent the facts, nor assert facts never admitted in evidence, *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000), but they may "argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence." *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005). Furthermore, when determining whether prosecutorial misconduct mandates habeas relief, courts may review the misconduct for harmless error. *Id.* at 641. An error is "harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

Petitioner challenges the prosecutor's statement that a clean, black-handled knife was found in a dirty car on the Halls' property. *See* Trial Tr. 44 (May 11, 2000). Petitioner contends that the remark left an erroneous inference that he put the knife there when he ran away from the police.

-15-

While it is true that there was no evidence establishing that Petitioner placed the knife in the car, the knife itself was insignificant, and  the prosecutor never claimed that the knife in evidence was the knife used during the CSC crimes. *Id.* 44, 137.  Moreover, there was some evidence to support the prosecutor's comment that the car was dirty, and a picture of the knife, as it appeared when Deputy Shanlian discovered it, was admitted in evidence.  Trial Tr. 47-48 (May 10, 2000).  Consequently, the jury was able to see for themselves whether the knife was dirty.  The Court concludes that the prosecutor's statement was not improper and, even if it was, the error could not have misled the jury and was harmless.

Petitioner also contends that the prosecutor inaccurately argued that J.W. identified him during the third photographic line-up.  The prosecutor's actual comment was that Petitioner "was positively identified . . . by both girls."  Trial Tr. 72 (May 11, 2000).  Although J.W. did not view the photographic arrays, she did identify Petitioner at trial.  Moreover, as the Michigan Court of Appeals recognized, the prosecutor was discussing J.W.'s trial testimony, not an out-of-court identification, when he made the disputed comment.  The remark was not improper.

Finally, Petitioner faults the prosecutor for insinuating that the family bought bullets and re-loaded the gun confiscated by the police.  The insinuation was a reasonable inference from the evidence, which established that three gunshots were fired from the weapon and that the weapon was fully loaded when it was returned to the police.  Thus, the prosecutor's remarks about the gun were proper.

2

Second, Petitioner contends that the prosecutor shifted the burden of proof when he said that defense counsel had "a lot of things to answer," Trial Tr. 123 (May 11, 2000) and when he suggested

-16-

that Petitioner must be guilty because he ran away from his apartment. *Id*. 70.  Prosecutors may not suggest that the defendant has the burden of proof or an obligation to produce evidence to prove his innocence.  *United States v. Clark*, 982 F.2d 965, 968-69 (6th Cir. 1993).   In this case, the prosecutor's comment that defense counsel had "a lot of things to answer" was made on rebuttal, in response to defense counsel's seventy-five minute closing argument.  The prosecutor implied that, because he had made a lengthy argument, defense counsel had many items to address.  There was no suggestion that Petitioner was obligated to prove anything and the prosecutor was entitled to "wide latitude" on rebuttal.  *Angel v. Overberg*, 682 F.2d 605, 607-08 (6th Cir. 1982) (*en banc*) (citing *DeChristoforo*, 416 U.S. at 637).  His argument was a fair response to defense counsel's argument.

The comment on flight was also proper.  Evidence of flight and attempts to avoid arrest are admissible under state law and can lead to an inference of guilt.  *People v. Biegajski*, 332 N.W.2d 413, 415 (Mich. Ct. App. 1982).  Furthermore, the prosecutor acknowledged that running away could mean something other than consciousness of guilt, Trial Tr.70 (May 11, 2000), and the trial court instructed the jurors that evidence of flight does not prove guilt.  The court explained that a person may run or hide for innocent reasons such as panic, mistake, or fear.  Trial Tr. 13 (May 12, 2000).  The trial court also stated that Petitioner was presumed innocent, that the prosecutor was required to prove every element of each of the crimes beyond a reasonable doubt, and that Petitioner was not required to prove his innocence or to do anything.  *Id*. 7-8.  The prosecutor's remarks were not improper, and even if they were, they were not flagrant and did not amount to constitutional error.

-17-

3

Third, Petitioner contends that the prosecutor knowingly elicited false testimony from Captain Compeau, Sergeant Potrafka, and Deputy Letaski. Specifically, Petitioner contends that Deputy Letaski lied about the details of her encounter with Petitioner on July 26, 1999, and the other officers lied about the number of gunshots fired from Letaski's weapon and the manner in which the third shot was fired.

Perjury is testifying falsely under oath or affirmation on a material matter with intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory. *United States v. Dunnigan*, 507 U.S. 87, 94 (1993), abrogated on other grounds by *United States v. Wells*, 519 U.S. 482 (1997). Prosecutors may not deliberately deceive a court or jurors by presenting known false evidence, nor allow unsolicited false evidence to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 153 (1972). "To prevail on a false-testimony claim, [a habeas petitioner] must show (1) that the prosecution presented false testimony, (2) that the prosecution knew was false, and (3) that was material." *Abdus-Samad v. Bell*, 420 F.3d 614, 625-26 (6th Cir. 2005), cert. denied, 549 U.S. 952 (2006). "[T]he statement in question [must be] 'indisputably false,' rather than merely misleading." *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000).

The testimony that Petitioner contends amounts to perjury consists primarily of minor discrepancies in the testimony. "[M]ere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) (citing *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987)). Furthermore, Petitioner has not shown that the alleged perjury was material evidence or that the prosecutor knew his witnesses were testifying falsely. Petitioner has failed to establish a claim of false testimony.

4

Fourth, and finally, Petitioner contends that the prosecutor failed to disclose evidence favorable to the defense. The evidence in question is Ronald Crichgon's report regarding Deputy Letaski's weapon. The report states that the firearm failed to extract and eject the fired cartridge case during testing. Petitioner claims that he could have used this report to show that Deputy Letaski's weapon fired only one time during the incident on July 26, 1999. The trial court adjudicated this claim on the merits and concluded that the evidence was not sufficient to require a new trial and that it would not have resulted in a different verdict on retrial.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). There are three components to a true *Brady* claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999). "Evidence is material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *O'Hara v. Brigano*, 499 F.3d 492, 503 (6th Cir. 2007) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Petitioner's *Brady* claim fails because Ronald Crichgon testified at trial, and Petitioner could have acquired Crichgon's report from him. "*Brady* does not apply when the information is available from another source . . . ." *Owens v. Guida*, 549 F.3d 399, 418 (6th Cir. 2008) (citing *Matthews v. Ishee*, 486 F.3d 883 (6th Cir. 2007)). Furthermore, although the report at issue might have supported

-19-

Petitioner's defense that only one gunshot was fired from Deputy Letaski's weapon, Sergeant Ives Potrafka testified that he heard two gunshots before he observed Petitioner struggling with Deputy Letaski and that Petitioner subsequently fired the gun at him.  Trial Tr. 37 (May 5, 2000).  Captain Michael Compeau testified similarly, and he claimed that he saw a flash from the gun as Petitioner turned and fired the third shot at him.  Trial Tr. 158-59 (May 9, 2000).  Deputy Letaski also saw a flash from the muzzle of the gun as Petitioner fired a gunshot before running away.  According to her, Petitioner fired two previous gunshots while she was struggling with him over the gun.  *Id.* 57-58.

Given the officers' testimony and the fact that the gun could have been altered after the shoot-out, but before Petitioner surrendered the gun to the police, it is unlikely that the result of the trial would have been different had Ronald Crichgon's report been disclosed to Petitioner.  Therefore, the report was not material evidence, and Petitioner's *Brady* claim lacks merit.

Based on the above, Petitioner is not entitled to habeas relief based on his claims of prosecutorial misconduct.

### D

Fourth, Plaintiff contends that he is entitled to habeas relief because he was denied a fair and impartial jury when juror Roxann Foster gave misleading answers during *voir dire* and opined that Petitioner was guilty.  Petitioner contends that the trial court should have questioned Ms. Foster more thoroughly and dismissed her for cause.  The Michigan Court of Appeals determined that this claim was not preserved for review by a challenge for cause.  The court of appeals concluded that the trial court's questioning of the jurors was sufficient and that juror Foster did not attempt to deceive the trial court about her ability to be impartial.

-20-

"The Sixth and Fourteenth Amendments guarantee a criminal defendant an impartial jury in state court." *Mahdi*, 522 F.3d at 636 (citing *Ristaino v. Ross*, 424 U.S. 589, 595 n.6 (1976), and *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

Read literally, the record of the *voir dire* indicates that Ms. Foster expressed the opinion that Petitioner was guilty. However, the colloquy between the trial court and the prospective jurors leads the Court to conclude that Helen Oliver made the disputed remark. The issue arose when the trial court asked how many people had seen or read something about the case. A number of prospective jurors apparently raised their hands in response. The trial court then individually questioned those jurors, starting with juror number one, Gary Carlson. The court directed that the microphone be passed to Mr. Carlson, who remembered reading or seeing something about a high profile case during the previous summer, but had not seen anything about the case recently. The trial court then questioned Kevin Armour and Roxann Foster, who gave similar responses that they recalled something from the past, but had not seen any recent media coverage about the case. The trial court then said, "All right. Let's go on down [the row.] Keep going. I know Ms. Oliver had her hand up." When Ms. Oliver stated that she had seen something on televison on the previous night, the trial court asked her what channel she had been watching. The transcript then indicates that Ms. Foster, rather than Ms. Oliver, answered, "12." Because the trial court had already spoken to Ms. Foster and was addressing Ms. Oliver at the time, it appears that Ms. Oliver, and not Ms. Foster, made the  response about television channel 12 and the remarks which followed, including the

comment that she had formed the opinion that Petitioner was guilty.  Trial Tr. 30-34 (May 2, 2000).

This reading of the record is supported by defense counsel's subsequent comment that only Ms. Oliver had been "very specific and very candid" about having formed an opinion.  Defense counsel asked whether any of the other jurors had formed an opinion on the basis of what they had heard about the case and whether the jurors could remember anything specific about the case.  There was no response to his questions.  Defense counsel then proceeded to address Ms. Oliver and to ask her whether, based on what she had heard, she had made the decision that the person was guilty.  Ms. Oliver answered, "Yes," and she stated that she formed her opinion the previous night.  *Id*. 65-67.  A short while later, defense counsel used a peremptory challenge to excuse Ms. Oliver.  *Id.* 74.

In conclusion, the context of the disputed remarks demonstrates that Petitioner and the Michigan Court of Appeals relied on an error in the transcript of trial.  The disputed comments attributed to Ms. Foster appear to have been made by Ms. Oliver, who was dismissed pursuant to a peremptory challenge.  " 'Any claim that the jury was not impartial . . . must focus . . . on the jurors who ultimately sat' on the jury, not on those dismissed through peremptory challenges." *Beuke v. Houk*, 537 F.3d 618 (6th Cir. 2008), cert. denied, 129 S. Ct. 2792 (2009).  Ms. Foster stated that she could be fair and impartial, and she was not challenged.  She remained on the jury until the conclusion of the case.  Based on the above, Petitioner is not entitled to habeas relief on this claim.

E

Fifth, Petitioner contends that his convictions for felonious assault and attempted murder should be vacated because the prosecutor attempted to prove the elements of CSC by relying on the same conduct that formed the basis for the felonious assault and attempted murder convictions.  The trial court addressed this claim on the merits and resolved the issue by stating that "[n]either the

-22-

felonious assault charge, nor the attempted murder by strangulation charge, served as a predicate offense for the criminal sexual conduct conviction."

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." The Clause protects against multiple punishments for the same offense. *Witte v. United States*, 515 U.S. 389, 396 (1995). "Under *Blockburger* [*v. United States*, 284 U.S. 299, 304 (1932)]*, penalties imposed under two separate statutes do not constitute double jeopardy if 'each provision requires proof of an additional fact which the other does not.' " *Carter v. Carter*, 59 F. App'x 104, 109 n.3 (6th Cir. 2003). The *Blockburger* test, however, "is a rule of statutory construction which guides federal courts in determining the scope of *federal* statutes." *Banner v. Davis*, 886 F.2d 777, 781 (6th Cir. 1989). "It does not necessarily apply to a federal court's construction of a state statute," and it "does not necessarily control the inquiry into the intent of a state legislature." *Id*. at 780.

"When assessing the intent of a state legislature, a federal court is bound by a state court's construction of that state's own statutes" and "a state court's determination of the legislature's intent." *Id.* at 780. "Thus, for purposes of double jeopardy analysis, once a state court has determined that the state legislature intended cumulative punishments, a federal habeas court must defer to that determination." *Id.*

The purpose of the statutes prohibiting CSC is to protect citizens against nonconsensual sexual activity, *see People v. Smith*, 733 N.W.2d 351, 362 (Mich. 2007), and the purpose of the felonious assault statute "is to discourage assaulting persons from inflicting even more serious injuries upon one another." *People v. Shelton*, 286 N.W.2d 922, 923 (Mich. Ct. App. 1979) (citing *People v. Van Diver*, 263 N.W.2d 370 (Mich. Ct. App. 1977)). The Michigan "Legislature intended

-23-

the crimes of criminal sexual conduct and felonious assault to be punished separately." *People v. Abram*, Nos. 151104, 182809, 1996 WL 33359111, at *3 (Mich. Ct. App. Sept. 13, 1996).

The purpose of the attempted-murder statute is to protect against intentional killing. *People v. Peerenboom*, 568 N.W.2d 153, 156 (Mich. Ct. App. 1997) (citing *People v. Graham*, 558 N.W.2d 2 (Mich. Ct. App. 1996)). The statute is aimed at protecting a distinct social norm from the social norm protected by the CSC statutes. Therefore, multiple punishments for CSC and attempted murder, as well as, felonious assault, do not violate the Double Jeopardy Clause. Petitioner is not entitled to habeas relief on this claim.

F

Sixth, Petitioner contends that his right to an appeal was violated because the Michigan Court of Appeals did not address the issue of whether his girlfriend, Lynn Furness, had authority to permit the police to enter his apartment. The contention that the state court failed to review all of Petitioner's claims fails to assert a claim of constitutional magnitude. *See, e.g.*, *Bacon v. Ricci*, No. 06-4910, 2008 WL 2354554, at *30 (D.N.J. June 3, 2008). The claim would have no merit even if it were cognizable on habeas review, because the court of appeals found it unnecessary to decide whether Ms. Furness possessed authority to admit the police into his apartment. The court stated that, "[e]ven if the initial police entry was improper, it is apparent that the affidavit submitted in support of the search warrant would have supported a finding of probable cause to search defendant's apartment absent any tainted information obtained during the brief, initial entry." *Hall*, 2003 WL 193517, at *2. Based on the above, Petitioner is not entitled to habeas relief on this claim.

G

Seventh, Petitioner contends that the prosecution failed to list a potential *res gestae* witness

-24-

named Mary Potter on the criminal information.  Ms. Potter apparently informed the police that she

may have seen the CSC suspect.  Petitioner claims that Ms. Potter may have been able to give a

different or more accurate description of the suspect than the description given by the complaining

witnesses and that the omission of Ms. Potter's name on the criminal information deprived him of

his constitutional right to compulsory process.

The Compulsory Process Clause of the Sixth Amendment generally entitles criminal

defendants to present competent, reliable, and exculpatory evidence. *DiBenedetto v. Hall*, 272 F.3d

1, 7-8 (1st Cir. 2002) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)).  However, the essence

of Petitioner's claim is that the prosecution failed to comply with Mich. Comp. Laws § 767.40a(2),

regarding the endorsement of *res gestae* witnesses.  "[F]ederal habeas corpus relief does not lie for

errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), and "[t]he Due Process Clause . . .

safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental

elements of fairness in a criminal trial.' " *Rivera v. Illinois*, 129 S. Ct. 1446, 1454 (2009) (quoting

*Spencer v. Texas*, 385 U.S. 554, 563-64 (1967)).  Inasmuch as Ms. Potter's testimony would have

been speculative, as opposed to competent and reliable, Petitioner was not deprived of a

fundamentally fair trial by the prosecution's failure to list Potter as a *res gestae* witness.  Thus,

Petitioner is not entitled to habeas relief on this claim.

H

Eighth, Petitioner contends that the trial court abused its discretion and deprived him of his

right to present a defense by refusing to allow him to present Patricia Hyde as a witness.  Petitioner

alleges that Ms. Hyde knew him and would have testified that she saw someone who looked like him

on the bike trail at 7:30 p.m. on July 24, 1999.  Petitioner maintains that this evidence was crucial

-25-

to his defense that the CSC complainants mis-identified him as the person who assaulted them.  The Michigan Court of Appeals addressed this issue and concluded that Petitioner's  right to present a defense was not violated by the exclusion of Ms. Hyde's testimony.  The court of appeals stated that Ms. Hyde's account of the person she mistakenly thought was Petitioner lacked detail and amounted to a mere suspicion and speculation that the person she saw could have committed the offenses.

"Few rights are more fundamental than that of an accused to present witnesses in his own defense. . . . Indeed, this right is an essential attribute of the adversary system itself." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).  An accused person, however, "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Id*. at 410.  Excluded evidence violates the right to present a defense only if the exclusion is arbitrary or disproportionate to the purpose it was designed to serve or infringes on a weighty interest of the accused.  *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  As explained by the Supreme Court in *Holmes v. South Carolina*:

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury . . . . [T]he Constitution permits judges "to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues.

547 U.S. 319, 326-27 (2006) (internal quotations and citations omitted).  "Evidence that tends to prove a person other than the defendant committed a crime is relevant, but there must be evidence that there is a connection between the other perpetrators and the crimes, not mere speculation on the part of the defendant." *DiBenedetto*, 272 F.3d at 8.

-26-

Patricia Hyde testified outside the jury's presence that she was acquainted with Petitioner and that, on the day of the CSC assault, she saw someone who resembled Petitioner sitting on a picnic table along the Clio bike trail. The man wore a navy baseball cap over black hair, which was combed back. The man did not have any facial hair, and Ms. Hyde could not remember what clothes the man was wearing. Trial Tr. 99-119 (May 10, 2000).

This sparse description of the person was not sufficiently specific or crucial so as to deprive Petitioner of a viable defense. While Ms. Hyde's testimony might have been relevant, it was not reliable evidence because it was vague and it did not connect the look-alike suspect to the crimes. The testimony was based on mere speculation that the person Ms. Hyde saw was the real offender. Ms. Hyde was not an eyewitness to the crime and she was not prepared to testify that she overheard someone else admit that they observed the crime. *Cf. Fleming v. Metrish*, 556 F.3d 520, 535-36 (6th Cir. 2009) (citing *Chambers*, 556 F.3d at 291, 295-98, 302, and *Washington v. Texas*, 388 U.S. 14, 22-23 (1967)). Furthermore, the "trial court did not rely on an evidentiary rule that irrationally excludes an entire category of witnesses from testifying on behalf of defendants, as in *Washington*." *Id*. at 536.

Even if Petitioner's right to present a defense was violated, the error could not have had a substantial and injurious effect on the jury's verdict in light of James Wray's testimony that he knew Petitioner and that Petitioner was seated on the picnic table on the evening of the CSC assault. Moreover, K.W. and J.W. spent a significant amount of time with the man who assaulted them, and they were certain that Petitioner was the man who strangled them and forced them to do things they did not want to do. Considerable circumstantial evidence also connected Petitioner to the crime. The alleged constitutional error, therefore, was harmless, and Petitioner is not entitled to habeas

relief on this claim.

I

Petitioner's ninth habeas claim alleges ineffective assistance of trial counsel. Petitioner alleges that defense counsel (1) failed to litigate Petitioner's Fourth Amendment issue, (2) did not properly argue a pretrial motion to suppress the victims' identification of Petitioner, and (3) and failed to challenge or advance certain evidence. Petitioner also contends that the cumulative effect of counsel's errors deprived him of a fair trial.

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), "qualifies as 'clearly established Federal law' " for purposes of evaluating ineffective-assistance-of-counsel claims. *Williams*, 529 U.S. at 391. Pursuant to *Strickland*, Petitioner must demonstrate that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. This requires showing "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Because of the difficulties inherent in evaluating defense counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). The prejudice prong of *Strickland* requires Petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

-28-

1

Petitioner contends that defense counsel should have filed a motion to suppress the evidence found in his apartment and on his parents' property as fruit of the unlawful searches and seizures. The Michigan Court of Appeals adjudicated the claim about Petitioner's apartment and concluded that defense counsel was not ineffective in failing to move to suppress evidence obtained from the apartment.

Although Petitioner's Fourth Amendment claim is not cognizable on habeas review pursuant to *Stone v. Powell*, Petitioner is not precluded from raising a Sixth Amendment claim based on counsel's alleged failure to litigate competently a Fourth Amendment claim. *Kimmelman v. Morrison*, 477 U.S. 365, 382-83 (1986). "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must . . . prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Id.* at 375.

The Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Payton v. New York*, 445 U.S. 573, 576 (1980). The prohibition against warrantless entry of a person's home to make an arrest or to conduct a search for specific objects does not apply when voluntary consent has been obtained; consent may be obtained from the individual whose property is searched or from a third party who possessed common authority over the premises or had a sufficient relationship to the premises or items sought to be inspected. *United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir. 2007), cert. denied, 129 S. Ct. 37 (2008) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), and *United*

*States v. Matlock*, 415 U.S. 164, 171 (1974)).

With respect to "consent," the Sixth Circuit has explained:

The government bears the burden of proving, through clear and positive testimony that the consent to search was given voluntarily. Consent is voluntary when it is unequivocal, specific and intelligently given, uncontaminated by any duress or coercion. Voluntariness is determined by examining the totality of the circumstances.

*United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (internal quotations and citations omitted). Indications that the police coerced, intimidated, or threatened to arrest an innocent person unless consent was provided undermines the voluntariness of the decision to grant consent and is an unacceptable means of obtaining consent. *Id*. at 403-04.

The record indicates that the police went to Petitioner's apartment complex about 10:30 p.m. on July 25, 1999. While they were investigating a truck supposedly owned by Petitioner, Petitioner's girlfriend, Lynn Furness, arrived on the scene. She admitted the officers to Petitioner's apartment. Although she did not live with Petitioner, she had a key to his apartment. She claimed at trial that she admitted the officers because Sergeant Potrafka's conduct was threatening and because he told her that he would arrest her if she did not cooperate. Defense counsel testified at a post-conviction hearing that, although Ms. Furness did not mention these threats to his investigator before trial, he was aware that she might make the allegation at trial.

The police, however, did not did not seize anything from Petitioner's apartment during the initial entry into his apartment. They merely determined that Petitioner was not there and that the telephone in the apartment rang when an officer called the telephone number painted on Petitioner's truck. The police subsequently acquired a warrant and then searched Petitioner's apartment and seized certain incriminating evidence.

Even if the initial entry into Petitioner's apartment was improper due to the lack of either a

-30-

warrant or voluntary consent to enter, no incriminating evidence was seized at the time, and evidence obtained from other locations was sufficient to convict Petitioner. Both CSC victims identified Petitioner at trial, and beer cans found in Petitioner's truck tended to link him to the crime. Therefore, defense counsel's failure to challenge the admission of items found in Petitioner's apartment did not prejudice the defense.

Defense counsel also was not ineffective for failing to move to suppress evidence taken from the home and property of Petitioner's parents. The police went to the Halls' residence early on July 26, 1999, with the expectation that they might locate Petitioner there and arrest him. They had probable cause to arrest Petitioner because K.W. had identified him on the previous day. There is no evidence that the police entered the Halls' home, and although the police encountered Petitioner on the Halls' property, he escaped. A search was not conducted until later, after the officers obtained a search warrant.

Defense counsel was not ineffective for failing to file motions to suppress because, as discussed above, Petitioner's Fourth Amendment claims lack merit. Even if defense counsel's performance were deemed deficient, there is not a reasonable probability that the verdict would have been different absent the seized evidence, because each victim identified Petitioner.

2

Petitioner also contends that defense counsel's motion to suppress the CSC complainants' identification of him was inadequate and should have pointed to specific acts of suggestiveness in the third photographic lineup. However, both the prosecutor and defense attorney agreed that the photographs themselves were not suggestive, and to Petitioner's advantage, someone other than him was pictured with long wavy hair and wearing a blue tank top like the suspect.

-31-

Defense counsel argued in a motion to suppress the complainants' identification of Petitioner that the pretrial identification procedure was suggestive because the police told K.W., after she identified someone other than Petitioner, to ignore the suspects' hair and concentrate on the faces of the men in the array. At a hearing on defense counsel's motion, Captain Compeau testified that he recalled K.W. saying that the hair of one person in the array was like her assailant, but that Petitioner was the actual assailant. Compeau did not recall anyone saying to K.W., "Don't look at the hair; look at the face, because hair can change." Trial Tr. 192 (May 2, 2000).

After the trial court denied defense counsel's motion to suppress the complainant's identification, defense counsel challenged the complainants' identification at trial by eliciting testimony that Deputy Sepanak had presented the third photo array to K.W. at approximately 1:00 a.m. on July 25, 1999. Defense counsel also brought out the fact that K.W. had to be awakened from her sleep to view the array and that Deputy Sepanak had indicated to K.W.'s mother that he had a suspect. Deputy Sepanak admitted in response to counsel's questions that he had told K.W. to ignore the suspects' hair and focus on their faces. Trial Tr. 43-47 (May 9, 2000). The Court concludes that defense counsel adequately raised the issue of K.W.'s identification of Petitioner.

As for J.W.'s in-court identification of Petitioner, there was an independent basis for her in-court identification, as previously discussed. Therefore, defense counsel's alleged failure to challenge J.W.'s identification did not prejudice the defense.

3

Petitioner also contends that defense counsel should have admitted some items in evidence and challenged the admission of other items. First, Petitioner contends that Gary Ginther's report about the beer cans was unreliable and should not have been admitted in evidence. Ginther is a

latent print examiner who testified that the number stamped on a beer can found on the bike trail where Petitioner was observed on July 24, 1999, fell within the sequence of numbers stamped on five beer cans found in Petitioner's truck.  Ginther further testified that, after investigating the matter, he determined that all six beer cans were processed at the same bottling plant, on the same line, and during the same fifteen-minute increment.

Although the number on the beer can found near the picnic table where the CSC occurred was not visible by the time it was admitted in evidence, Mr. Ginther explained to the jury that, when he sprayed the can with a dye to facilitate his search for fingerprints, the number on the bottom of the can washed off.  He was able to tell the jury what the number was because he recorded the number before he inadvertently wiped it off the can.  Trial Tr. 14-15 (May 10, 2000).

Defense counsel objected without success to the admission of the beer cans in evidence, and there was no basis for objecting to Ginther's testimony.  Defense counsel performed adequately by eliciting testimony that there was a gap in the numbers embossed on the bottom of the cans.  *Id.* 18.

Second, Petitioner contends that defense counsel should have objected to the admission of underwear and a blue tank top found in his apartment.  Petitioner contends that this evidence was inadmissible character evidence.  The prosecutor, however, did not submit the evidence as character evidence.  The evidence was admitted to show that Petitioner owned clothes like those worn by the suspect.  The clothing and other evidence seized from Petitioner's apartment and his parents' residence was obtained pursuant to search warrants.  The evidence was relevant to the issues and its probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  Mich. R. Evid. 402 and 403.  Therefore, defense counsel was not ineffective for the failure to object to clothing seized from Petitioner's apartment.

-33-

Third, Petitioner contends that defense counsel should have introduced letters of recommendation indicating that Petitioner had a good record as a security guard. Petitioner's mother testified that Petitioner was a former security guard. This evidence provided an explanation for the presence of a handcuff case in Petitioner's apartment. Letters indicating that Petitioner was a good employee would not have advanced his defense that the CSC complainants mis-identified him. Thus, defense counsel was not ineffective for attempting to admit a former employer's letters of recommendation.

4

Petitioner's final allegation about trial counsel is that the cumulative effect of defense counsel's errors deprived him of a fair trial. "The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002). Thus, it cannot be said that the state court's resolution of Petitioner's ineffectiveness claims was contrary to Supreme Court precedent so as to warrant habeas relief.

J

Petitioner's tenth habeas claim is that his appellate attorney provided ineffective assistance. The gist of Petitioner's claim is that his appellate attorney's arguments were inadequately pleaded and that counsel failed to raise certain additional issues presented in the habeas petition.

Although defendants in criminal cases are entitled to effective assistance of counsel on direct appeal of their convictions, *Franklin v. Anderson*, 434 F.3d 412, 428 (6th Cir. 2006), an attorney need not raise every nonfrivolous argument suggested by the appellant if counsel decides as a matter of professional judgment not to raise those arguments. *Evitts v. Lucey*, 469 U.S. 387, 393-94 (1985); *Jones v. Barnes*, 463 U.S. 745, 751 (1983). "Notwithstanding *Barnes*, it is still possible to bring a

-34-

*Strickland* [ineffectiveness] claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). "In such cases, the petitioner must demonstrate that the issue not presented 'was clearly stronger than issues that counsel did present.' " *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003) (quoting *Robbins*, 528 U.S. at 289).

The claims that Petitioner raised on appeal are not clearly stronger than the claims which his attorney raised in the appeal of right. In fact, the Michigan Court of Appeals rejected Petitioner's *pro per* issues, and Petitioner concedes that his attorney's issues had merit. Consequently, appellate counsel's performance was not deficient. There is not a reasonable probability that the result of the appeal would have been different had counsel included all of Petitioner's claims in the appeal of right. *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005) (citing *Greer v. Mitchell*, 264 F.3d 663 (6th Cir. 2001)). Petitioner has failed to demonstrate that his appellate attorney was constitutionally ineffective and he is not entitled to habeas relief on this claim.

## K

Petitioner's eleventh, and final, habeas claim is that he is actually innocent of the crimes for which he was convicted. Petitioner contends that his claim of actual innocence is a gateway to substantive review of his barred claims. The Court, however, has not held that any of Petitioner's claims are procedurally defaulted and thus barred from review, and Petitioner concedes that a claim of actual innocence "is not itself a constitutional claim." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). Even if it were a cognizable claim, "[t]he threshold for any hypothetical freestanding innocence claim [is] 'extraordinarily high.' " *House v. Bell*, 547 U.S. 518, 555 (2006) (quoting *Herrera*, 506 U.S. at 417). A petitioner must show that, in light of some new and reliable evidence,

-35-

more likely than not, a reasonable juror would have reasonable doubt about the petitioner's guilt. *Id*. at 536-38; *Ross v. Berghuis*, 417 F.3d 552, 556 (6th Cir. 2005) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner purports to have new evidence of a lab report showing that the gun he used during the shoot-out with the police malfunctioned after only one gunshot. No reasonable juror would have had reasonable doubt about Petitioner's guilt or innocence if the lab report had been admitted in evidence, because defense counsel made that argument at trial, and three police officers testified to the contrary that the gun fired three times. Although the lab report could have been used to impeach the officers' testimony, the jury could have concluded that Petitioner altered the gun before he turned it in to the police. The Court concludes that this is not one of the rare and extraordinary cases in which a claim of actual innocence warrants a new trial.

### III

As discussed above, the state court decisions did not result in unreasonable determinations of the facts and were not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Thus, the petition for habeas corpus will be denied.

However, the Court will grant a certificate of appealability on Petitioner's claim that his right to present a defense was violated by the trial court's refusal to permit him to present Patricia Hyde as a witness. A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002). In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).

To demonstrate this denial, the applicant is required to show that reasonable jurists could

debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).  When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484.  Reasonable jurists could debate the Court's resolution of Petitioner's claim that his right to present a defense was violated by the trial court's refusal to permit him to present Patricia Hyde as a witness and whether the claim deserves encouragement to proceed further. *See Banks v. Dretke*, 540 U.S. 668, 674 (2004) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)).  In contrast, the Court will deny a certificate of appealability as to the remainder of Petitioner's claims as Petitioner has not made a substantial showing of the denial of a constitutional right as to those claims.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [Dkt. 1] is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **GRANTED** on Petitioner's claim that his right to present a defense was violated by the trial court's refusal to permit him to present Patricia Hyde as a witness, and **DENIED** as to the remainder of Petitioner's claims.

It is further **ORDERED** that Petitioner is **GRANTED** leave to proceed in forma pauperis on appeal because an appeal would be taken in good faith.  Fed. R. App. P. 24(a)(4)(B).

> s/Thomas L. Ludington
> THOMAS L. LUDINGTON
> United States District Judge

Dated: August 13, 2009

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 13, 2009.

s/Tracy A. Jacobs
TRACY A. JACOBS